AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of Connecticut

| | |
|---|---|
| United States of America<br>v.<br><br>FRANK BIANCUR, JR.<br><br>*Defendant(s)* | Case No.<br>3:15MJ-_93_____(SALM) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __April 23, 2013 to Present__ in the county of __New Haven__ in the _____ District of __Connecticut__, the defendant(s) violated:

*Code Section*        *Offense Description*

18 U.S.C. § 1341      Mail Fraud
18 U.S.C. § 1346      Theft of Honest Services

This criminal complaint is based on these facts:

See Attached Affidavit of Special Agent Christian T. Roccia, FBI.

☑ Continued on the attached sheet.

*Complainant's signature*

Christian T. Roccia, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __05/26/2015__      /s/ Sarah A. L. Merriam, USMJ
                                    *Judge's signature*

City and state: __New Haven, Connecticut__      Sarah A.L. Merriam, U.S. Magistrate Judge
                                                    *Printed name and title*

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

STATE OF CONNECTICUT          :
                              :
                              :
                              :   May 26, 2015
                              :
COUNTY OF NEW HAVEN           :

### AFFIDAVIT OF SPECIAL AGENT CHRISTIAN T. ROCCIA

I, Christian T. Roccia, a Special Agent of the Federal Bureau of Investigation, New Haven Division, having been duly sworn, state:

### Introduction

1. I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") since November 2007. While being trained as a Special Agent of the FBI, I have received training on how to investigate a wide range of matters, with my primary background being the investigation of public corruption and narcotics trafficking.

2. Over the past eight years in federal law enforcement, I have spent a good portion of time assigned to investigations of violent criminal enterprises that participate in drug trafficking, firearms trafficking, and violent crimes. I have coordinated the controlled purchases of illegal drugs utilizing confidential sources, confidential human sources and undercover law enforcement officers; written, obtained and coordinated the execution of search and arrest warrants pertaining to individuals involved in illegal activities; conducted electronic as well as physical surveillance of individuals involved in illegal activities; analyzed records documenting the purchase and sale of illegal contraband; provided testimony both in Grand Jury proceedings and District Court proceedings; and spoken with informants, subjects and cooperating defendants, as well as other local, state and Federal law enforcement officers, regarding the manner in which criminals

−1−

distribute, obtain, finance, store, manufacture, transport, and distribute their illegal contraband. I have supervised the activities of informants who have provided information and assistance in connection with federal prosecutions.

3. Over the past several years, I have directly participated in public corruption investigations, including interviewing witnesses and suspects, and executing arrest warrants and search warrants. I am currently assigned to investigate primarily matters of public corruption and am one of Agents that has directed the investigation that is the subject of this Affidavit. I have participated fully in this investigation and, as a result of this participation, as well as information provided by other law enforcement officers, I am thoroughly familiar with the information contained herein. This Affidavit is submitted in support of a criminal complaint and a warrant authorizing the arrest of FRANK BIANCUR, JR. ("BIANCUR"). As described below, there is probable cause to believe and I do believe that BIANCUR has sought and received multiple illegal payments in order for him to take certain action in his role of Zoning Officer for the Town of East Haven, all in violation of 18 U.S.C. §§ 1341 and 1346 (theft of honest services and mail fraud).

4. The information contained in this affidavit is based on my personal knowledge and involvement in this investigation, information obtained by other agents and/or investigators involved in this matter, as well as other information gathered during the course of this investigation. This Affidavit is submitted for the limited purpose of establishing probable cause. Accordingly, it does not include all the information gathered in this investigation, but contains only that information sufficient to establish probable cause for the requested arrest warrant.

## Probable Cause

5. This investigation focuses on BIANCUR's solicitation of illegal personal payments with the understanding that he would take steps to smooth any issues with the zoning office for the Town of East Haven, which was under his direction and control as Town's Planning & Zoning Administrator/Zoning Enforcement Officer.

6. In May 2015, the FBI was contacted by a resident of East Haven, Connecticut, who will be identified herein as "Victim-1." Victim-1 approached the FBI to complain that he/she had been extorted for the last several years by Biancur, acting in his capacity as the Zoning Enforcement Officer.

7. Victim-1 first became acquainted with Biancur on or about October 10, 2012. Victim-1 received a letter via the United States Postal Service from Biancur regarding trash being dumped in the state-owned vacant lot adjacent to Victim-1's residence, located in East Haven, Connecticut. Victim-1 provided this letter and the United States Postal Service certified mail envelope, post marked October 10, 2012, to the interviewing Agents. Soon after receiving the letter, Biancur started calling Victim-1 on his/her mobile telephone and his/her home telephone regarding this issue. Victim-1 met Biancur in Biancur's office in East Haven town hall to discuss the issue. Biancur demanded Victim-1 clean the trash from the vacant lot even though the trash did not belong to Victim-1, as well as pay a fine. Victim-1 paid Biancur $400 cash. Victim-1 asked Biancur for a receipt but he/she was not given one.

8. Victim-1 received a second letter from Biancur dated April 15, 2013, advising Victim-1 would be charged $100 per day if the garbage was not cleaned up in the lot. Victim-1 provided this letter and the United States Postal Service certified mail envelope, post marked April 15, 2013, to the interviewing Agents. Victim-1 believed he/she had no choice but to

–3–

comply with Biancur's demands and he/she spent his/her own money on a dumpster and labor to clear the lot of garbage. Victim-1 provided a receipt for the dumpster, which he/she showed to Biancur, to the interviewing Agents. Biancur told Victim-1 that neighbors were complaining about the trash on and around his/her property. When Victim-1 asked who these neighbors were, Biancur told Victim-1 he could not disclose their identities, but the complaints were taken by his secretary. Biancur insisted Victim-1 pay the fines, and Victim-1 paid Biancur $1,000 cash. Victim-1 asked Biancur for a receipt but he/she was not given one.

9. The illegal dumping in the lot continued and Victim-1 successfully took video of an individual throwing garbage into the lot. Victim-1 brought the video to the police and the individual was arrested. Victim-1 provided copies of the police reports regarding this arrest to the Agents.

10. Biancur later informed Victim-1 he/she was required to pay Biancur for the cost incurred by the town to install large rocks placed in front of the vacant lot to deter people from illegally dumping in the lot. Victim-1 asked Biancur if he/she could purchase the vacant lot since he/she was made by Biancur to care for its upkeep. Biancur informed Victim-1 he/she could not purchase it since the land was owned by "FEMA." Biancur then provided Victim-1 with a letter dated September 30, 2014, which stated no one could purchase or develop the vacant lot. Victim-1 provided this letter to the interviewing Agents. Biancur charged Victim-1 $500 for this letter, which Victim-1 paid in cash and was not given a receipt, although he/she did ask for one.

11. Victim-1 asked Biancur why Victim-1 never received the promised receipts in the mail, and Biancur replied the receipts were sent by a different department. Biancur told Victim-1 not to worry because Victim-1 had Biancur looking out for him/her.

12. On July 9, 2014, Victim-1 applied for a permit to build a deck in the rear of his/her residence. The Zoning Permit Application was filled out for Victim-1 by Biancur, signed by Victim-1, and approved by Biancur. Soon after, Biancur called Victim-1 and instructed Victim-1 to go to Biancur's office to pick up the permit. Biancur charged Victim-1 $30 cash, which Victim-1 paid at the counter in front of Biancur's office, and $500 cash, which Victim-1 gave to Biancur in his office behind closed doors. Victim-1 recalled Biancur put the cash in Biancur's pants pocket. Victim-1 provided the permits he/she received via the United States Postal Service from Town Hall, number ▬▬ dated August 6, 2014, and the envelope, post marked August 7, 2014, to the interviewing Agents. On one copy of the permit the following is typed: "Received the fee of $ 96.30".

13. Sometime between August and December 2014, Victim-1 submitted a handwritten revision to his/her original plan for a deck. The document, which Victim-1 provided to the Agents, was signed by both Victim-1 and Biancur. On December 16, 2014, Victim-1 filled out an "Application for Inspections" for his/her residence and provided it to James Bassett, who signed the application. Victim-1 then went to Biancur's office and paid Biancur $400.00 cash for the new permit in Biancur's office behind closed doors. No receipt was provided by Biancur although one was requested by Victim-1. A few days later Victim-1 received in the mail a "Letter of Zoning Compliance" signed by Biancur. Victim-1 provided this document, and the envelope in which it was mailed, post marked December 18, 2014, to the Agents.

14. On December 24, 2014, Bassett inspected Victim-1's addition. Victim-1 provided a letter dated December 30, 2104, and labeled "Certificate of Approval" to the interviewing Agents which Victim-1 received in the mail. The letter, signed by James A.

−5−

Bassett, Building Official, informed Victim-1 the work completed at his/her residence was inspected and found to be satisfactory. The letter listed three permit numbers, all of which were permit numbers not known to Victim-1. Bassett did not charge Victim-1 and money for this letter.

15. On or about April 23, 2015, Biancur called Victim-1 and advised the Mayor called Biancur and insisted Victim-1's renovations were not approved for living space. Biancur told Victim-1 he/she needed to go to Town Hall to get another permit for the addition. Victim-1 complied and went to Town Hall on April 24, 2015, and reviewed an application for building permit number ▇▇▇ which Biancur filled out on behalf of Victim-1. While in Biancur's office behind closed doors, Biancur gave Victim-1 a "Letter of Zoning Compliance," dated April 23, 2015. Victim-1 paid Biancur $530 cash for this letter, which Biancur put in his pants pocket. Victim-1 then left Biancur's office and paid Bassett $213.12 for the permit. Bassett signed the application filled out for Victim-1 by Biancur and gave Victim-1 a receipt for the $213.12 payment. Soon thereafter, Victim-1 received via the United States Postal Service permit number ▇▇▇, on which the following is typed: "Received the fee of $ 213.12". Victim-1 also provided the envelope in which the permit was mailed, post marked May 8, 2015. Victim-1 provided these documents to the interviewing Agents.

16. Sometime in late 2014, Victim-1 asked Biancur for permission to place a permanent storage box behind his/her house on his/her property. Later, when Victim-1 met Biancur in his office, Biancur was in possession of a Zoning Permit Application required for Victim-1 to keep the storage on the container, which Biancur filled out on behalf of Victim-1. The date of the document was "12/17/09." When Victim-1 asked Biancur about the

2009 date, Biancur informed Victim-1 he had to back-date the application because the town ordinances changed and current ordinances would not allow Victim-1 to keep the container on his/her property. Victim-1 advised Biancur filled out the entire document, including the signature of the town's previous zoning enforcement officer, George Mingione, who held the job in 2009. Biancur charged Victim-1 two separate fees, $400 and $300, for two "Leter (sic) of Zoning Approval." Both were dated December 19, 2009, and both were signed by George Mingione. Victim-1 never met Mingione. Victim-1 provided these documents to the interviewing Agents.

17. On Tuesday May 19, 2015, Biancur called Victim-1 and informed Victim-1 he had to inspect his/her addition immediately and take pictures per the Mayor's orders. Biancur informed Victim-1 he was fighting for Victim-1 so he could keep his/her addition. Biancur was able to get the town to agree to Victim-1 keeping the carpet on the ground floor, which should only be storage. Biancur then threatened to tear down Victim-1's addition because it was non-compliant. Victim-1 informed Biancur he/she was at work and could not comply. Biancur said he had to inspect the home that week because he was going on vacation the following week. Biancur also demanded $200 immediately or he would make Victim-1 tear down the addition.

18. On May 21, 2015, Victim-1 engaged in a consensually recorded [audio/video] meeting with Biancur in Biancur's office in Town Hall under the supervision and direction of the investigating Agents. The meeting was arranged during a consensually recorded telephone call placed earlier in the afternoon. Victim-1 was also given $200 of FBI evidence funds to be used to pay Biancur as Biancur demanded.

19. Biancur began the meeting by advising Victim-1 that according to a 500-page

–7–

FEMA manual, Victim-1 needed a permit for his/her already-completed addition from FEMA because the enclosed porch is in a flood plain. Biancur advised that "they" were willing to allow Victim-1 to keep the addition as is provided small changes were made. Biancur advised that he planned to visit Victim-1's property on Tuesday [May 26, 2015] to take pictures to document that the changes were made.

20. Biancur then told Victim-1 to "put it [$200] in there," as Biancur pointed to a folder on his desk. Victim-1 did not immediately provide the money, and Biancur got up and closed the office door.

21. Victim-1 then asked Biancur about the back-dated and forged 2009 letters previously provided to Victim-1 by Biancur which gave Victim-1 permission to store the large container on his/her property. Victim-1 reminded Biancur he/she gave Victim-1 the letter this year or last, and Biancur affirmed by nodding his head. When Victim-1 pointed out that the name on the letter was not Biancur's, Biancur replied, "Right, that was the guy who was here in '09... He was my position in '09." Victim-1 then asked if George Mingione signed the letter or if Biancur signed it, and Biancur replied, "I signed it."

22. Victim-1 told Biancur that he/she is not a wealthy man/woman and asked when the payments to Biancur are going to stop. Biancur replied, "Would you want to take that whole thing [addition] down? Think about it." Victim-1 responded that he/she did not want to take it down. Biancur replied, "So that's what I'm saying, we're doing our best to keep it up." Biancur continued and reminded Victim-1 that Victim-1 originally wanted to build a deck then changed it to an enclosed porch. Victim-1 replied, "But I pay you." Biancur responded in a low voice, "I know that," and he made a "shhhh" sound. Victim-1 continued, "I pay you, you know how much I pay, I pay you almost 3,000 dollars." Biancur then placed his index finger

−8−

on his lips and again shushed Victim-1. When Victim-1 stated that no one was there, Biancur responded, "She's [secretary] right outside that door."

23. Victim-1 advised he/she was nervous about the possibility of his/her home being torn down, and Biancur again instructed the changes Victim-1 needed and added, "we're fighting for you." Victim-1 asked Biancur when the need to pay will stop, and Biancur replied while shaking his head, "That's it, this is it." Victim-1 replied, "Promise?" Biancur agreed, "Promise." Victim-1 confirmed, "No more money?" Biancur responded, "No. No. You don't have to spend any more money, you won't have to spend any more money, I swear to you."

24. The discussion again turned towards Victim-1's desire to park a storage container on his/her property and the forged document. Biancur advised that he would see what he could do about the container for Victim-1, but he could not promise Victim-1 anything because they just passed a law. Victim-1 replied, "The container I paid you almost 500 dollars." Biancur responded, "No, you only paid me two [$200; Biancur held up two fingers to Victim-1]." Victim-1 replied, "No that was 500 dollars." Biancur stated while shaking his head, "No, listen to me…shhhh…listen to me, I will do what I can. Keep the container out of there for about a month. Get out of this jam first [the latest need for an inspection]." Biancur continued, "Just don't talk about the money you gave me." Victim-1 replied, "What?" Biancur repeated, "Don't talk about the money you gave me."

25. Victim-1 told Biancur he/she thought when he/she gave "something" to Biancur, that Biancur would have to take care of him/her. Biancur replied that he is taking care of Victim-1. Biancur explained that he and Jim Bassett "have gone to bat" for Victim-1 with the Mayor's Office in relation to the Town Engineer's concerns about Victim-1's property.

–9–

Biancur stated, "If it wasn't for me and Jim, you would have orders to take that [addition] down." Biancur continued, "So all you got to do is the [changes], the 200 dollars today and you're good." Biancur added, "Just, we're taking care of you, believe me, if it wasn't for Jim and I right now, you'd have to take that whole thing down."

26. When Victim-1 again expressed concern over the 2009 letter, Biancur instructed Victim-1 what to say: "Say, 'A couple years ago, I called the zoning office to come out to my property. I told him I wanted to put a container here permanently. He gave me a letter saying I could.'" Biancur advised that the rules have changed and stated, "I had to back date this letter…So this letter comes into play before this ordinance did, so hopefully they won't, they'll leave you alone." Victim-1 asked if the name George Mingione was really the person in Biancur's position and Biancur confirmed, "I didn't make his name up. That was the guy that was here before me." Victim-1 asked, "How about the signatures?" Biancur replied, "Yeah, that looks just like his." Victim-1 asked, "You did it?" Biancur replied, "Yeah I did it."

27. Victim-1 then pleaded, "I paid you so much money brother you have to fix this mess." Biancur replied, "I'm working on it. I didn't know this rule [FEMA]." Biancur then advised he was able to allow Victim-1 to keep the rug in the enclosed porch. Biancur stated, "I got you to keep the rug, that was big, I had to argue that one, so." Victim-1 thanked Biancur and Biancur nodded his head. Biancur again informed Victim-1 that once Victim-1 completes the required changes and the pictures are taken the CO [Certificate of Occupancy] will get circulated around for approvals. Biancur assured although the Town Engineer might have a problem with the CO, the Mayor's Office will handle the Engineer.

28. Victim-1 then reached into his/her pocket and took out the FBI evidence funds.

He/she stated, "Okay boss, today I don't have the big bills [large denominations of currency], you already got a lot of big...[Victim-1 then counts the money]...here's 200 dollars boss, you can count it, trust me?"   Biancur nodded affirmatively and replied, "One hundred percent." [Biancur can then be heard counting the money].   Victim-1 later reported Biancur placed the money in his pants pocket.   The two then engaged in further conversation about the necessary changes to Victim-1's addition, and the two agreed Biancur would inspect the residence the following Tuesday.

## Conclusion

29.    Based on the foregoing, I respectfully submit that there is probable cause to believe that BIANCUR has committed violations of 18 U.S.C. §§ 1341 and 1346 (theft of honest services and mail fraud).   Accordingly, I respectfully request that the Court issue a warrant for BIANCUR's arrest.

### Sealing

30. Because this Affidavit and the accompanying documents pertain to an ongoing criminal investigation, and because the disclosure of the information contained in these documents at this time may compromise the investigation, I request that this Affidavit, the criminal complaint, and the non-disclosure order all be ordered sealed, until further order of the Court.

_____
CHRISTIAN T. ROCCIA
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION


Subscribed and sworn to before me at New Haven, CT
this the 26th day of May, 2015


___/s/ Sarah A. L. Merriam, USMJ____
HONORABLE SARAH A. L. MERRIAM
UNITED STATES DISTRICT MAGISTRATE JUDGE